Filed 8/8/13  P. v. Goodson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C071877 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF094651) |
| v. | |
| ANTHONY WAYNE GOODSON, | |
| Defendant and Appellant. | |

A jury found defendant Anthony Wayne Goodson guilty of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a); count1), possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 2), carrying a dirk or dagger concealed on the person (former Pen. Code, § 12020, subd. (a)(4), now § 21310; counts 3 & 4; unless otherwise stated, all statutory references that follow are to the Penal Code), and misdemeanor resisting or obstructing a peace officer (§ 148, subd. (a)(1); count 5).

We note that counts 3 and 4 involved carrying a dirk or dagger concealed on the person.  (Former § 12020, subd. (a)(4).)  However, the information and verdict forms

1

listed the count 3 offense as a violation of former section 12020, subdivision (a)(1), which does not apply to a dirk or dagger. Nevertheless, the jury was properly given a single instruction that applied to both counts and correctly set forth the elements of the dirk or dagger offense. To eliminate confusion, we shall modify the judgment on counts 3 and 4 to reflect convictions of section 21310, the successor to former § 12020, subdivision (a)(4).

The jury found that defendant committed count 4 while released from custody. (§ 12022.1, subd. (b).) The trial court found that he had a prior serious felony conviction (§ 667, subds. (b)-(i)) and had served two prior prison terms (§ 667.5, subd. (b)). Defendant's request to strike the second-strike allegation was granted. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.) He was sentenced to prison for seven years eight months and was awarded 844 days' custody credit and 422 days' conduct credit.

On appeal, defendant contends (1) in both contacts with police, the officers had no valid basis to detain him or to conduct a patdown search of his person, (2) principles of equal protection entitle him to additional presentence conduct credit, and (3) the evidence of his prior serious felony conviction was insufficient. We affirm the judgment.

DISCUSSION

I

*Suppression Motions*

Defendant contends the evidence obtained in both contacts with police should have been suppressed because neither officer had a valid basis to detain him or to conduct a patsearch of his clothing. We consider the incidents in turn.

A.      *General Principles of Detention and Patsearches*

"'The Fourth Amendment protects against unreasonable searches and seizures. [Citations.] "A detention is reasonable under the Fourth Amendment when the detaining

2

officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." [Citation.] Ordinary traffic stops are treated as investigatory detentions for which the officer must be able to articulate specific facts justifying the suspicion that a crime is being committed. [Citations.] [¶] . . . [¶] Law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citations.]" [Citation.]' [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145-146 (*Letner*).)

"Even in a general sense, the reasonable suspicion standard of *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889] is not a particularly demanding one, but is, instead, 'considerably less than proof of wrongdoing by a preponderance of the evidence.' [Citation.]" (*Letner, supra*, 50 Cal.4th at p. 146.) Moreover, "the constitutional reasonableness of traffic stops [does not depend] on the actual motivations of the individual officers involved." (*Whren v. United States* (1996) 517 U.S. 806, 813 [135 L.Ed.2d 89, 98].)

A police officer may conduct a limited, protective patsearch for weapons when he has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations.]" (*Terry v. Ohio*, *supra*, 392 U.S. at p. 27 [20 L.Ed.2d p. 909].) "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." (*Adams v. Williams* (1972) 407 U.S. 143, 146 [32 L.Ed.2d 612, 617].)

A patsearch is a minimal intrusion upon an individual's Fourth Amendment rights. (*People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1230.) We are mindful that "[t]he

3

judiciary should not lightly second-guess a police officer's decision to perform a patdown search for officer safety. The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations." (*People v. Dickey* (1994) 21 Cal.App.4th 952, 957.)

### B. *October 2, 2009 Incident*

#### 1. *Facts from Suppression Hearing*

Defendant filed a motion to suppress evidence that was heard in conjunction with the preliminary examination. The evidence relevant to the motion was as follows.

On October 2, 2009, about 2:30 a.m., Davis Police Officer Michael Moore was on patrol. He observed a black male subject, later identified as defendant, on a bicycle that had no front lamp or rear reflector. Defendant approached a group of three women who were talking together on the street. He appeared to be conversing with them and circled around them for approximately 30 seconds. He was wearing a tan leather jacket and blue jeans. Both the defendant and the females moved out of Officer Moore's view.

Shortly thereafter, Officer Moore was flagged down by the females he had seen earlier. They reported that a black male adult on a bicycle had harassed them. They specified that the male had persistently asked them questions about where they were going and whether he could "hook up" with them that evening. When the females told the male that they were not interested and that he should ride away and not talk to them anymore, the male became verbally aggressive with them. He said something like "I'm a gangster, you don't know who you're messing with." The women said they did not want to go home because they did not want the defendant to see where they lived.

Officer Moore advised dispatch that he would be on the lookout for a subject on a bicycle regarding a harassment complaint. He also contacted fellow Davis Police Officer Justin Raymond and related his observations to him.

Officer Raymond confirmed that he had heard Officer Moore's radio report, which included the subject's description as well as his comments that he was a "gangster" and that "you don't know who you're messing with."

Less than a minute later, Officer Raymond saw defendant riding his bicycle. Officer Raymond noted that the bicycle did not have a red rear reflector, a violation of the Vehicle Code. When defendant saw Officer Raymond behind him, he stopped his bicycle. Officer Raymond did not turn on his emergency lights. The subject began yelling and swearing before Officer Raymond could get out of his car. At that point, Officer Raymond identified the subject as defendant, whom he knew from previous contacts. In Officer Raymond's experience, defendant was uncooperative and aggressive, both physically and verbally, toward the police.

As Officer Raymond got out of his car, defendant threw his bicycle down on the sidewalk. He paced and yelled as he put his hands in and out of his pockets. Officer Raymond told defendant that his bicycle did not have a rear reflector and that Raymond wanted to talk to defendant about the women he had been talking to. Defendant responded with more profanity and said that he was not going to talk to Officer Raymond.

At this point, defendant's hands were completely concealed inside the pockets of his large leather jacket that were capable of concealing a weapon. In contrast, Officer Raymond was wearing a short-sleeve shirt and was comfortable with the outside temperature. He asked defendant at least three times to remove his hands from his jacket pockets. Defendant replied by telling Officer Raymond "F you."

Officer Raymond feared for his safety, based on his "numerous prior contacts with [defendant]. The fact that he was aggressive for no reason towards me. His body language and demeanor were way out of context for what was happening. I wasn't able to reason with him, and he kept concealing his hands and part of his clothing that were capable of concealing a weapon."

5

Based on his observations and concerns, Officer Raymond decided to conduct a patsearch of defendant and told him so. Defendant, with his hands still in his pockets, replied that Officer Raymond was not going to pat him down for weapons and that defendant no longer was on parole. Officer Raymond approached defendant and tried to turn him so that he was facing away from Raymond for a patsearch. Defendant "ripped" his arm out of his pocket and away from Officer Raymond. As he did this, defendant yelled, "I have a knife" or "I've got a knife." Then he tried to put his hand back into his jacket pocket.

Officer Raymond struck defendant on the side of his face in an attempt to stop him from retrieving a weapon. Officer Raymond also advised defendant that he was under arrest. Defendant continued to flail and yell, but Officer Raymond took him to the ground and eventually handcuffed him. A seven-inch-long knife was found in the jacket pocket over which defendant and Officer Raymond had fought. The pocket had completely concealed the knife.

Davis Police Officer Alan Hatfield testified about the incident. He arrived where the arrest was made after Officer Raymond and observed defendant yelling and pacing back and forth. Defendant was putting his hands in his pockets, removing them, and then putting them back in the pockets.

When Officer Raymond tried to patsearch defendant, Officer Hatfield assisted by taking hold of defendant's right arm. Defendant responded by forcefully pulling his arm out of Officer Hatfield's grasp. As the officers handcuffed defendant, he indicated that he had a knife in his pocket.

During a booking search at Yolo County Jail, officers found a plastic vial containing methamphetamine in his pants pocket.

Following argument by the prosecution and the defense, the trial court denied defendant's suppression motion.

6

2. *Analysis*

Defendant first claims Officer Raymond's detention of him was not justified. But Officer Raymond had an objectively reasonable basis to detain defendant: the lack of a rear reflector on his bicycle. (Veh. Code, § 21201, subd. (d)(2).) Officer Raymond testified that he noticed the absence of a rear reflector and notified defendant of that fact when he stopped him.

Defendant counters that "the reasons for the contact were unrelated to" the lack of a rear reflector. The point is unavailing. Because Officer Raymond had an objectively reasonable basis for the stop, any additional subjective motives the officer may have had were irrelevant. (*Whren v. United States, supra,* 517 U.S. at p. 813 [135 L.Ed.2d at p. 98].) It is not necessary to consider whether defendant's contact with the three females provided an independent justification for a detention.

Defendant also contends Officer Raymond was not justified in conducting a patsearch for weapons. In defendant's view, there was "no information available" to Officer Raymond that warranted his forceful execution of a patsearch. The totality of the circumstances refutes this claim.

Officer Raymond contacted defendant at 2:30 a.m. after receiving reports that defendant had "harassed" three females to such an extent they felt the need to inform the police. During his contact with the females, defendant had warned them that "I'm a gangster, you don't know who you're messing with." This warning was relayed to Officer Raymond. It is common knowledge that members of criminal street gangs often carry guns and other weapons. (*In re H.M.* (2008) 167 Cal.App.4th 136, 146.)

When Officer Raymond first approached him, defendant violently overreacted to the officer. Defendant threw his bicycle to the ground and began yelling profanities at Officer Raymond before he could say anything to defendant. A suspect's "hostile and

7

aggressive" behavior toward an officer is a factor supporting a patsearch. (*People v. Lopez* (2004) 119 Cal.App.4th 132, 137.)

Defendant was wearing a bulky jacket that was inconsistent with the weather conditions and was capable of concealing a weapon. (See *People v. Rios* (2011) 193 Cal.App.4th 584, 589; *In re Frank V.* (1991) 233 Cal.App.3d 1232, 1240.) Defendant repeatedly returned his hands to his pockets and ignored Officer Raymond's requests to keep his hands out of the pockets. (*Frank V.,* at p. 1241 [returning hands to pockets, after being told to take them out, is an "additional factor" justifying a patsearch].)

Defendant argues that his "refusal to consent to a search cannot itself form the basis for a reasonable suspicion he is armed." But the foregoing actions went far beyond a mere refusal of consent. Defendant's hostile, aggressive and noncompliant conduct properly led Officer Raymond to suspect that he was armed. (*People v. Lopez, supra,* 119 Cal.App.4th at p. 137.) Defendant's hostile and aggressive conduct distinguishes the present case from *In re H.H.* (2009) 174 Cal.App.4th 653, on which he relies, in which the minor merely said "I'm not on probation" and refused to consent to a search. (*Id.* at p. 656.) Defendant's conduct also distinguished this case from *People v. Dickey, supra,* 21 Cal.App.4th 952, which held a patsearch could not be justified by the facts the defendant (1) had no identification, (2) refused to allow the deputy to search the vehicle, (3) was nervous and sweating, or (4) possessed baking powder in a film canister. (*Id.* at p. 956.)

Alternatively, defendant's refusal to comply with Officer Raymond's directives to keep his hands visible and out of his pockets constituted willful resistance, delay, or obstruction of the officer's discharge of his duties as a peace officer. (§ 148, subd. (a)(1).) Based on his conduct that evening, defendant was charged with and convicted of this offense. Because the violation occurred prior to the patsearch, defendant was subject to a search incident to arrest at the time of the patsearch. (*Virginia v. Moore* (2008) 553

U.S. 164, 176-177 [170 L.Ed.2d 559, 571].)  Defendant's suppression motion was properly denied.

C. *May 29, 2010 Incident*

1. *Facts from Suppression Hearing*

Defendant filed a motion to suppress evidence that was heard in conjunction with the preliminary examination.  The evidence relevant to the motion was as follows.

On May 29, 2010, about 3:10 a.m., Davis Police Officer Ryan Bellamy was on patrol.  He observed defendant riding his bicycle without a required bicycle light.  Defendant was wearing baggy pants and a baggy jacket or sweatshirt.  Officer Bellamy initiated a traffic stop.

Officer Bellamy had prior contacts with defendant and had advised him on several occasions to get a bicycle light.  Officer Bellamy also knew defendant to be a heavy drug user.  In addition, Officer Bellamy was aware of defendant's previous altercation, a few months earlier, with Officer Raymond in which defendant was arrested and found in possession of a knife.  Moreover, Officer Bellamy had received an e-mail from his sergeant stating that a confidential source had reported that defendant had been carrying a semi-automatic pistol.

Based on the circumstances, and his knowledge of defendant, Officer Bellamy feared for his safety and wanted to conduct a patsearch of defendant for weapons.  When Officer Bellamy indicated that he would patsearch defendant before writing the traffic citation, defendant said, "you can't search me."  When Officer Bellamy explained that he was not going to do a full search and was just going to patdown defendant for weapons, defendant again said "no."

Officer Bellamy grabbed defendant's arm and asked him if he possessed anything he should not have.  Defendant replied that he had a pocket knife in his back pocket.

9

Officer Bellamy located a fixed blade knife completely concealed in defendant's right rear pant pocket.

Following argument by the parties, the trial court denied the suppression motion. The court explained: "At 3 o'clock in the morning, somebody you've stopped half a dozen times that you know as a drug user and has been combative with the police in the past, I think he has a right to at least pat him down." The court concluded, "given the totality of the circumstances even leaving out the [tip regarding a firearm], a good officer would conduct a patdown search."

2. *Analysis*

As with the October 9, 2009 incident, Officer Bellamy had an objectively reasonable basis to stop defendant--the lack of a light on his bicycle. This violation of the Vehicle Code gave the officer a lawful basis to stop defendant. (*Whren v. United States, supra,* 517 U.S. at p. 813.)

In addition, Officer Bellamy had sufficient cause to suspect that defendant may be armed. Most importantly, Officer Bellamy had knowledge that a few months previous, under very similar circumstances, defendant had been found carrying a concealed, fixed-blade knife. Officer Bellamy also knew that the previous incident had involved a physical altercation between defendant and the police. Awareness that defendant had been armed and combative in an almost identical situation is a strong factor supporting a reasonable suspicion that defendant was again armed and may be combative. " '[A]wareness that the suspect was armed on a previous occasion' " is a legitimate factor supporting a patsearch. (*People v. Osborne* (2009) 175 Cal.App.4th 1052, 1061.)

Officer Bellamy's decision to conduct a patsearch was further supported by his awareness that defendant was a heavy user of narcotics. (Cf. *People v. Huerta* (1990) 218 Cal.App.3d 744, 750 [it was reasonable to believe a person entering a residence of illicit drug activity might be armed].) The decision was also supported by defendant's

10

wearing of baggy clothing that could permit easy concealment of a weapon. (*People v. Collier* (2008) 166 Cal.App.4th 1374, 1377, fn. 1 ["the wearing of baggy clothing, coupled with other suspicious circumstances . . . furnishes the requisite facts to support a patdown for weapons"].)

In denying the suppression motion, the trial court does not appear to have relied on the anonymous tip regarding the firearm. Rather, the court appears to have relied on the totality of circumstances other than the tip. Because those circumstances amply support denial of suppression, we have no occasion to analyze the tip for the first time on appeal.

II

*Presentence Conduct Credit*

Defendant contends principles of equal protection entitle him to additional conduct credit for his incarceration from October 1, 2011, until his sentencing on August 21, 2012.

In October 2009, when it enacted the former version of section 4019 (Sen. Bill No. 18) that was at issue in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), "the Legislature did not expressly declare whether former section 4019 was to operate prospectively or retroactively." (*Brown,* at p. 320; see Stats. 2009, 3d Ex. Sess., 2009-2010, ch. 28, § 50.) Particularly relevant for present purposes, the Legislature never purported to bar the Senate Bill No. 18 version of section 4019 from applying to *crimes that occurred* prior to its operative date. Thus, persons who committed crimes prior to the operative date of Senate Bill No. 18 but served presentence custody both prior to and following that effective date earned "bifurcated" credit at two different rates. In concluding the statute applied prospectively only, the *Brown* court noted: "To apply former section 4019 prospectively necessarily means that prisoners whose custody overlapped the statute's operative date (Jan. 25, 2010) earned credit at two different rates." (*Brown,* at p. 322.)

11

In contrast, when it enacted the present version of section 4019 as part of realignment, the Legislature expressly barred the statute from applying to crimes committed prior to its operative date, October 1, 2011. (§ 4019, subd. (h).) Because the present credit scheme, by its terms, does not give enhanced credit for crimes committed prior to October 1, 2011, the scheme does not allow prisoners whose custody overlapped the statute's operative date to earn credit at two different rates.

Rather, defendant's entitlement to credit is governed by section 4019, subdivision (h), which states in relevant part: "Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." Because both of defendant's crimes predated the September 28, 2010, enactment of Senate Bill No. 76 (Stats. 2010, ch. 426, § 2), the relevant "prior law" is the Senate Bill No. 18 version that was considered in *Brown*. (See § 4019, subd. (g) [applying the Sen. Bill No. 76 formula to crimes "committed on or after" Sept. 28, 2010].)

Because defendant has a prior serious felony conviction (see part III, *post*), Senate Bill No. 18 did not entitle him to additional conduct credit. (*Brown, supra*, 54 Cal.4th at p. 318, fn. 5.) The trial court struck the allegation that the prior conviction constitutes a "strike," but this does not affect defendant's entitlement to presentence conduct credit under section 4019.

Defendant's claim that he is entitled to credit at two different rates, because a different bifurcated credit scheme had been approved in *Brown*, ignores the significant differences in the two versions of section 4019.

Defendant nevertheless contends he is entitled to bifurcated credit based on *People v. Olague* (2012) 205 Cal.App.4th 1126, which considered the language of section 4019, subdivision (h). However, the Supreme Court granted review in *Olague* and then dismissed review and remanded the matter to the Sixth Appellate District in light of *Brown*. (*Olague, supra*, 205 Cal.App.4th 1126, review dism. Mar. 20, 2013, S203298.) As defendant acknowledges, the court in *People v. Ellis* (2012) 207 Cal.App.4th 1546

(*Ellis*) examined the same language considered in *Olague* and concluded: "In our view, the Legislature's clear intent was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011. [Citation.] The second sentence [of section 4019, subdivision (h)] does not extend the enhanced rate to any other group, but merely specifies the rate at which all others are to earn conduct credits. So read, the sentence is not meaningless, especially in light of the fact the October 1, 2011, amendment to section 4019, although part of the so-called realignment legislation, applies based on the date a defendant's crime is committed, whereas section 1170, subdivision (h), which sets out the basic sentencing scheme under realignment, applies based on the date a defendant is sentenced." (*Ellis*, at p. 1553.) We agree with *Ellis*.

We thus conclude, as a matter of statutory construction, that defendant is not entitled to additional "bifurcated" conduct credit under the present version of section 4019.

After determining that principles of statutory construction and legislative intent required the Senate Bill No. 18 version of section 4019 to be applied prospectively only, the court in *Brown* concluded such application did not violate principles of equal protection. (*Brown*, *supra*, 54 Cal.4th at pp. 322-323, 328-330.) In *People v. Lara* (2012) 54 Cal.4th 896, the court more recently concluded the Legislature did not violate equal protection by making its 2011 amendment of section 4019 expressly prospective. (*Lara*, at p. 906, fn. 9; § 4019, subd. (h).)

Defendant acknowledges that, under *Brown*, equal protection is not violated where a prisoner whose *entire* presentence custody occurred prior to October 1, 2011, earns a lesser rate of conduct credit than a prisoner whose *entire* presentence custody occurred after that date. But he claims equal protection *is* violated where, as here, prisoners in presentence custody *after October 1, 2011*, earn different rates of conduct credit depending on *whether their offense occurred* prior to that date. We disagree.

13

" 'The obvious purpose of the new section [4019] . . . is to affect the behavior of inmates by providing them with incentives to engage in productive work and maintain good conduct while they are in prison.' [Citation.] '[T]his incentive purpose has no meaning if an inmate is unaware of it.' " (*Brown*, *supra*, 54 Cal.4th at p. 329, quoting *In re Strick* (1983) 148 Cal.App.3d 906, 913.)

As we have seen, the present version of section 4019 does not, by its terms, give enhanced credit for crimes committed prior to October 1, 2011. Nor did decisional authority extend the statute's reach beyond its textual bounds before defendant was sentenced on August 21, 2012. Thus, having committed his crime prior to October 1, 2011, defendant could not have been aware, or even reasonably suspected, based on anything more than speculation, he would be entitled to enhanced credit during any portion of his presentence incarceration, even the part occurring after October 1, 2011. Section 4019 could not have encouraged defendant, who was unaware of any such incentive, to engage in productive work or maintain good conduct. (*Brown*, *supra*, 54 Cal.4th at p. 329.) This is so even though the statute gave such an incentive to other simultaneously incarcerated inmates who committed their crimes *after* October 1, 2011.

Following *Brown*, we conclude the "important correctional purposes of a statute authorizing incentives for good behavior [citation] are not served by rewarding prisoners who . . . could not have modified their behavior in response." (*Brown*, *supra*, 54 Cal.4th at pp. 328-329.) "That prisoners who [commit crimes] before and after [present] section 4019 took effect are not similarly situated necessarily follows." (*Brown*, at p. 329; see *Ellis*, *supra*, 207 Cal.App.4th at pp. 1551-1552.) Because the groups are not similarly situated, it is not necessary to consider defendant's arguments that the proper standard of review is strict scrutiny and that there is no compelling state interest, or rational basis, for the disparity in treatment. Defendant's equal protection claim has no merit.

14

# III

## *Substantial Evidence of Prior Robbery Conviction*

Defendant contends the evidence was insufficient to support the true finding on the allegation of a prior serious felony conviction.  The People respond that the contention is moot because the trial court struck the allegation at sentencing.  We consider the issue because it remains relevant to defendant's entitlement to presentence conduct credit.  (See part II, *ante*.)

Defendant admitted during trial that he had been convicted of robbery in 1982.  The admission is sufficient evidence, by itself, to sustain the trial court's finding.  (See *People v. Watts* (2005) 131 Cal.App.4th 589, 594-595 ["generally an admission of a prior conviction allegation admits all elements of the prior conviction and all elements of offenses necessarily included in the prior conviction offense, just as a plea of guilty admits every element of a charged offense"]  In California, all robberies are both serious and violent felonies.  (§§ 667.5, subd. (c)(9), 1192.7, subd. (c)(19).)  Defendant's admission to a prior robbery conviction provided sufficient evidence that he had the prior conviction.

It is not necessary to consider defendant's contention that evidence in addition to his admission, specifically People's exhibit 7 containing information from the Department of Corrections and Rehabilitation, Division of Juvenile Justice, is insufficient because it was not a part of the "record of conviction" within the meaning of *People v. Guerrero* (1988) 44 Cal.3d 343.  Defendant was ineligible for presentence conduct credit at the increased rate formerly provided by Senate Bill No. 18.  (*Brown, supra,* 54 Cal.4th at p. 318, fn. 5.)

DISPOSITION

The judgment is modified to reflect convictions on counts 3 and 4 of violation of section 21310. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


          HULL           , J.


We concur:


      BLEASE         , Acting P. J.


      BUTZ           , J.